# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 17-cv-00742-NYW

DAVID LOFLEY,

      Plaintiff,

v.

NANCY A. BERRYHILL, Acting Commissioner of Social Security,

      Defendant.

---

## MEMORANDUM OPINION AND ORDER

---

Magistrate Judge Nina Y. Wang

      This action comes before the court pursuant to Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 401-33 and 1381-83(c) for review of the Acting Commissioner of Social Security's final decision denying Plaintiff David Lofley's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Pursuant to the Order of Reference dated August 21, 2017 [#14], this civil action was referred to the Magistrate Judge "for all purposes" pursuant to 28 U.S.C. § 636(c) and D.C.COLO.LCivR 72.2(e). The court has carefully considered the Complaint filed March 24, 2017 [#1], Plaintiff's Opening Brief, filed June 27, 2017 [#12], Defendant's Response Brief, filed July 20, 2017 [#18], the entire case file, the administrative record, and applicable case law. For the following reasons, I respectfully AFFIRM IN PART and REVERSE AND REMAND IN PART the Commissioner's decision.

# PROCEDURAL HISTORY

Plaintiff David Lofley ("Plaintiff" or "Mr. Lofley") protectively filed applications for DIB and SSI on October 8, 2012. *See* [#9-6 at 250-258].[1] Plaintiff alleges he became disabled on April 16, 2011, at the age of 47, due to complications stemming from a heart attack, neck and shoulder injuries, and memory loss. *See* [#9-6 at 250, 256]. His claims were initially denied on December 19, 2012, and upon reconsideration on March 5, 2013. Plaintiff filed a written request for a hearing on March 25, 2013. [#9-4 at 119, 126, 145]. Originally, Mr. Lofley appeared for a hearing on September 15, 2014 that was postponed based on Plaintiff's request. [#9-2 at 41]. Plaintiff and a non-attorney representative, William Myerholtz, appeared for a hearing before Administrative Law Judge Carl C. McGhee ("ALJ") on November 12, 2014, and for a supplemental hearing on August 12, 2015. [#9-2 at 31, 43].

Mr. Lofley has a high school education and completed four years of plumbing school. [#9-2 at 46]. During the November hearing, Plaintiff testified that he is married but has been separated from his wife for over twelve years. [*Id.*] He was living with his in-laws at the time of the hearing. [*Id.*] He has worked as a plumber and plumber supervisor, a pipe fitter, a cook, a dining room attendant, a manager in food service, and a construction worker. [*Id.* at 54-55]. Plaintiff testified that he last worked in June of 2011, which is when he suffered a heart attack. [*Id.* at 46]. Since the heart attack, he is easily tired and cannot walk as far as before the attack, he suffers pain in his neck and shoulders, and he began having seizures, potentially from a compressed nerve, which was resolved when he had a disc in his neck replaced. [*Id.* at 47].

---

[1] The court uses this designation to refer to the Electronic Court Filing system ("ECF") document number attached to the Administrative Record and the page number of the Administrative Record as it was filed by the Parties. Plaintiff's citations and Defendant's citations similarly refer to the page number of the Administrative Record, or, where applicable, the page number of a brief. *See, e.g.,* [#12 at 2; #13 at 1].

When asked what activities exacerbate his pain, Plaintiff identified "[w]eed eating, cutting the grass, picking up too much weight at one time and…chaotic situations." He testified that the duration of his pain correlates to his level of stress, and that if he is "really stressed out [the pain] lasts as long as the stress lasts." [*Id.*] He also testified that he can stand for approximately four hours if moving around and can stand in one place for approximately one hour. He can sit for approximately five hours before he feels "antsy" and wants to move around. [*Id.* at 48]. Plaintiff testified that he can lift approximately twenty-five pounds, and he carries his baby grandniece, whom he helps babysit. However, he testified that he is unable to lift weight over his head and he has difficulty holding onto objects. [*Id.*] His balance improved following the neck surgery, but he testified that he continues to exhibit mild symptoms such as tremors in his hands. [*Id.*] In response to questioning by Mr. Myerholtz, Plaintiff testified that he could grate and chop vegetables for approximately one hour before his arms would grow tired and ache; and he testified that his knee would also ache from standing. [*Id.* at 53]. Plaintiff is right-handed.

Mr. Lofley additionally suffers from certain mental health issues. He testified that he gets along okay with other people, but he "get[s] to the point where I feel like I need to go because somebody is watching me or they're out to get me." [#9-2 at 49]. When asked if he has friends, Plaintiff testified, "[n]ot really," and that he prefers not to "go out too much in public." [*Id.*] Plaintiff also testified that he has difficulty completing tasks due to lack of focus, though he helps with certain household chores such as cleaning dishes, sweeping, and vacuuming. [*Id.* at 50]. In response to questioning by Mr. Myerholtz, Plaintiff testified that of his health concerns, his ability to work is most impeded by his mental health issues, and he referenced specifically feelings of paranoia and auditory hallucinations. [*Id.* at 50-51].

Steven Simon testified as a vocational expert ("VE"). The ALJ queried him whether work exists for a person of Plaintiff's age with the same educational and work history, who is limited as follows: lift and/or carry twenty pounds occasionally and ten pounds frequently; stand and/or walk for four hours in an eight hour day; sit for four hours in an eight hour day; occasionally push and pull with his upper extremities; requires an alternating sit, stand option every two hours; occasionally climb ramps and stairs; avoid climbing ladders and scaffolds; frequently balance, stoop, kneel, and crouch; occasionally crawl and reach waist to chest with both arms; avoid reaching above shoulder level with both arms; frequently handle and finger with the right hand and constantly handle and finger with the left hand, and constantly feel; tolerate occasional exposure to extreme cold and heat, occasional exposure to wetness and/or humidity, occasional exposure to vibration, and occasional exposure to pulmonary irritants; frequently work around moving mechanical parts; avoid working at high and exposed sites; can perform simple, routine, and repetitive tasks and can understand, remember, and carry out simple instructions; able to adapt to infrequent changes in the work setting; and can frequently interact with the public but only occasionally interact with supervisors and coworkers. [#9-2 at 55-56]. Mr. Simon testified that such a person could perform none of Plaintiff's previous jobs nor any other job in the national economy. [*Id.* at 56-57].

The ALJ thereafter spoke with Mr. Lofley at a supplemental hearing held on August 12, 2015. Plaintiff introduced no new evidence, but testified that he had been involved in a car accident following the November 2014 hearing and had reinjured his neck. [#9-2 at 33-34]. He testified that his mental health issues remained the same. The ALJ then posed questions to Nicholas Ferdanza, who testified as the VE. Mr. Ferdanza identified only cook and pipe fitter as work Plaintiff had performed in the previous fifteen years. [*Id.*] The ALJ then posed a

4

hypothetical to Mr. Ferdanza that removed several of the physical restrictions identified in the first hypothetical, and asked if work exists for a person of Plaintiff's age with the same educational and work history, who is limited as follows: lift and/or carry twenty pounds occasionally and ten pounds frequently; stand and/or walk for four hours in an eight hour day; sit for four hours in an eight hour day; *frequently* push and pull with his upper extremities,[2] *occasionally* reach above shoulder level with both arms, and *constantly* reach waist to chest with both arms; *constantly* handle, finger, and feel with both hands; *frequently* climb ramps and stairs; avoid climbing ladders and scaffolds; frequently balance, stoop, kneel, and crouch and *frequently* crawl; tolerate exposure to extreme cold, and tolerate occasional exposure to extreme heat, wetness and/or humidity, vibration, and pulmonary irritants; *constantly* work around moving mechanical parts; avoid working at high and exposed sites; can perform simple, routine, and repetitive tasks and can understand, remember, and carry out simple instructions; able to adapt to infrequent changes in the work setting; and can frequently interact with the public but only occasionally interact with supervisors and coworkers. [*Id.* at 35-36]. The VE testified that such person could not work as a cook or pipe fitter, but could work as an electronics worker, for which there are 50,000 jobs in the national economy, in small products assembly, for which there are 100,000 jobs in the national economy, and ticket taker, for which there are 45,000 jobs in the national economy.

The ALJ denied Mr. Lofley's application in a written decision issued November 6, 2015, concluding that he was not disabled. [#9-2 at 10-22]. Plaintiff requested review of the ALJ's decision, which the Appeals Council denied on January 26, 2017. [#9-2 at 1]. The decision of the ALJ then became the final decision of the Commissioner. 20 C.F.R. § 404.981; *Nielson v.*

---

[2] The use of italics denotes a change in limitation from the first hypothetical.

*Sullivan*, 992 F.2d 1118, 1119 (10th Cir. 1993) (citation omitted). Plaintiff filed this action on March 24, 2017. The court has jurisdiction to review the final decision of the Commissioner. 42 U.S.C. § 405(g).

## STANDARD OF REVIEW

In reviewing the Commissioner's final decision, the court is limited to determining whether the decision adheres to applicable legal standards and is supported by substantial evidence in the record as a whole. *Berna v. Chater*, 101 F.3d 631, 632 (10th Cir. 1996) (citation omitted); *Pisciotta v. Astrue*, 500 F.3d 1074, 1075 (10th Cir. 2007). The court may not reverse an ALJ simply because he may have reached a different result based on the record; the question instead is whether there is substantial evidence showing that the ALJ was justified in his decision. *See Ellison v. Sullivan*, 929 F.2d 534, 536 (10th Cir. 1990). "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007) (internal citation omitted). Moreover, the court "may neither reweigh the evidence nor substitute [its] judgment for that of the agency." *White v. Massanari*, 271 F.3d 1256, 1260 (10th Cir. 2001), *as amended on denial of reh'g* (April 5, 2002). *See also Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) ("The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.") (internal quotation marks and citation omitted). However, "[e]vidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992) (internal citation omitted). The court will not "reweigh the evidence or retry the case," but must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in

order to determine if the substantiality test has been met." *Flaherty,* 515 F.3d at 1070 (internal

citation omitted). Nevertheless, "if the ALJ failed to apply the correct legal test, there is a

ground for reversal apart from a lack of substantial evidence." *Thompson v. Sullivan,* 987 F.2d

1482, 1487 (10th Cir. 1993) (internal citation omitted).

## ANALYSIS

### I.      The ALJ's Decision

Mr. Lofley seeks both SSI and DIB benefits. An individual is eligible for SSI benefits

under the Act if he is financially eligible, files an application for SSI, and is disabled as defined

in the Act. 42 U.S.C. § 1382. An individual is determined to be under a disability only if his

"physical or mental impairment or impairments are of such severity that he is not only unable to

do his previous work but cannot, considering his age, education, and work experience, engage in

any other kind of substantial gainful work which exists in the national economy…." 42 U.S.C. §

1382c(a)(1)(3)(B). The Supplemental Security Income Program, established by Title XVI of the

Social Security Act, 86 Stat. 1465, as amended, 42 U.S.C. § 1381 *et seq.*, provides for the

payment of disability benefits based solely on an individual's indigent status and is therefore a

need-based program available to claimants independent of their prior social security

contributions. *See Bowen v. City of New York,* 476 U.S. 467, 470, 106 S.Ct. 2022, 90 L.Ed.2d

462 (1986). By contrast, the Social Security Disability Insurance Program established by Title II

of the Social Security Act, 49 Stat. 622, as amended, 42 U.S.C. § 401 *et seq.*, provides for the

payment of disability benefits only to those who have previously contributed to the program and

who suffer from a mental or physical disability. *See Bowen,* 476 U.S. at 470. An individual is

eligible for DIB benefits under the Act if he is insured, has not attained retirement age, has filed

an application for DIB, and is under a disability as defined in the Act. 42 U.S.C. § 423(a)(1).

Additionally, the claimant must prove he was disabled prior to his date last insured. *Flaherty*, 515 F.3d at 1069. To receive either set of benefits, the disabling impairment must last, or be expected to last, for at least twelve consecutive months. *See Barnhart v. Walton*, 535 U.S. 212, 214-15 (2002).

The Commissioner has developed a five-step evaluation process for determining whether a claimant is disabled under the Act. 20 C.F.R. § 404.1520(a)(4)(v). *See also Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988) (describing the five steps in detail). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Williams*, 844 F.2d at 750. Step one determines whether the claimant is engaged in substantial gainful activity; if so, disability benefits are denied. *Id.* Step two considers "whether the claimant has a medically severe impairment or combination of impairments," as governed by the Secretary's severity regulations. *Id.*; *see also* 20 C.F.R. §§ 404.1520(e), 416.909. If the claimant is unable to show that his impairments would have more than a minimal effect on his ability to do basic work activities, he is not eligible for disability benefits. If, however, the claimant presents medical evidence and makes the *de minimis* showing of medical severity, the decision maker proceeds to step three. *Williams*, 844 F.2d at 750. Step three "determines whether the impairment is equivalent to one of a number of listed impairments that the Secretary acknowledges are so severe as to preclude substantial gainful activity," pursuant to 20 C.F.R. §§ 404.1520(d), 416.920(a)(4)(iii).. *Id.* At step four of the evaluation process, the ALJ must determine a claimant's Residual Functional Capacity ("RFC"), which defines what the claimant is still "functionally capable of doing on a regular and continuing basis, despite his impairments: the claimant's maximum sustained work capability." *Williams*, 844 F.2d at 751. The ALJ compares the RFC to the claimant's past relevant work to

determine whether the claimant can resume such work.  *See Barnes v. Colvin*, No. 14-1341, 2015 WL 3775669, at *2 (10th Cir. June 18, 2015) (internal quotation marks omitted) (citing *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996) (noting that the step-four analysis includes three phases: (1) "evaluat[ing] a claimant's physical and mental [RFC]"; (2) "determin[ing] the physical and mental demands of the claimant's past relevant work"; and (3) assessing "whether the claimant has the ability to meet the job demands found in phase two despite the [RFC] found in phase one.")).   "The claimant bears the burden of proof through step four of the analysis." *Neilson v. Sullivan*, 992 F.2d 1118, 1120 (10th Cir. 1993).

At step five, the burden shifts to the Commissioner to show that a claimant can perform work that exists in the national economy, taking into account the claimant's RFC, age, education, and work experience.  *Neilson*, 992 F.2d at 1120.

> . . . A claimant's RFC to do work is what the claimant is still functionally capable of doing on a regular and continuing basis, despite his impairments: the claimant's maximum sustained work capability. The decision maker first determines the type of work, based on physical exertion (strength) requirements, that the claimant has the RFC to perform. In this context, work existing in the economy is classified as sedentary, light, medium, heavy, and very heavy. To determine the claimant's "RFC category," the decision maker assesses a claimant's physical abilities and, consequently, takes into account the claimant's exertional limitations (i.e., limitations in meeting the strength requirements of work). . . .
>
> If a conclusion of "not disabled" results, this means that a significant number of jobs exist in the national economy for which the claimant is still exertionally capable of performing. However, . . . [t]he decision maker must then consider all relevant facts to determine whether claimant's work capability is further diminished in terms of jobs contraindicated by nonexertional limitations.
> …
>
> Nonexertional limitations may include or stem from sensory impairments; epilepsy; mental impairments, such as the inability to understand, to carry out and remember instructions, and to respond appropriately in a work setting; postural and manipulative disabilities; psychiatric disorders; chronic alcoholism; drug dependence; dizziness; and pain….

*Williams*, 844 F.2d at 751-52. The Commissioner may rely upon the testimony of a vocational expert to satisfy his burden at step five, so long as the question posed to the vocational expert accurately portrays Plaintiff's limitations as supported by the record. *See Qualls v. Apfel*, 206 F.3d 1368, 1373 (10th Cir. 2000); *Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir. 1992).

The ALJ first determined that Mr. Lofley was insured for disability through December 31, 2016. Next, following the five-step evaluation process, the ALJ concluded that Mr. Lofley: (1) had not engaged in substantial gainful activity since the alleged onset date of April 16, 2011; (2) had severe impairments of hypertension, coronary artery disease, arthralgia, degenerative disc disease, bipolar disorder not otherwise specified, schizoaffective disorder, and generalized anxiety disorder; and (3) did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in Title 20, Chapter III, Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.925, 416.926). At step four, the ALJ found that Plaintiff had residual functional capacity to perform light, unskilled work, limited as follows: lift and/or carry twenty pounds occasionally and ten pounds frequently; stand and/or walk for four hours in an eight-hour day; sit for four hours in an eight-hour day; frequently push and pull with his upper extremities, occasionally reach above shoulder level with both arms, and constantly reach waist to chest with both arms; constantly handle, finger, and feel with both hands; frequently climb ramps and stairs; avoid climbing ladders and scaffolds; frequently balance, stoop, kneel, crouch, and crawl; can tolerate exposure to extreme cold, and tolerate occasional exposure to extreme heat, wetness and/or humidity, vibration, and pulmonary irritants; constantly work around moving mechanical parts; avoid working at high and exposed sites; can perform simple, routine, and repetitive tasks and can understand, remember, and carry out simple instructions; able to adapt to infrequent changes in the work setting; and can

frequently interact with the public but only occasionally interact with supervisors and coworkers. [#9-2 at 15].

Mr. Lofley asserts three arguments in objection to the ALJ's decision. First, Plaintiff contends that the RFC as formulated by the ALJ does not account for all of the limitations noted by the consultative examining psychologist, Fred Alberts, Ph.D., despite the ALJ's decision to attribute great weight to Dr. Alberts's opinion. Second, Plaintiff argues the ALJ erred in concluding that he can constantly handle and finger with both hands. Finally, Plaintiff asserts that the ALJ improperly assessed his credibility regarding pain. [#12 at 1-2]. Defendant responds that substantial evidence supports the ALJ's findings, and that "[b]ecause the ALJ's decision is based on a reasonable interpretation of the evidence, the Court should affirm regardless of whether Plaintiff can identify a different reasonable interpretation of the evidence." [#13 at 5-6].

## II. ALJ's Findings at Step Four

### A. ALJ's Treatment of Dr. Alberts's Opinion

Mr. Lofley argues that the ALJ improperly failed to include in the RFC Dr. Alberts's findings that he has moderate limitations in completing simple tasks and "marked limitations in adjusting to usual work situations or changes in a routine work setting." [#12 at 22]. Defendant contends that Plaintiff "does not provide a meaningful explanation for how Dr. Alberts's opinion and the RFC finding are inconsistent." [#13 at 6-7].

Dr. Alberts conducted a consultative psychological evaluation of Plaintiff on August 27, 2014. *See* [#9-10 at 531-538]. Dr. Alberts assessed Plaintiff as mildly impaired regarding attention and concentration, moderately restricted "in understanding, remembering, carrying out or making judgment on simple work-related instructions," and markedly restricted "in

understanding, remembering and carrying out complex work-related instructions.  [#9-2 at 19]; *see* [#9-10 at 531-538].  Dr. Alberts also opined that Plaintiff would have only mild difficulty interacting with the public, but moderate difficulty interacting appropriately with supervisors and coworkers, and marked difficulty responding appropriately to work changes.  [*Id.*]  The ALJ gave Dr. Alberts's opinions great weight, noting "they are consistent with the medical evidence of record, the claimant's daily activities, and the RFC stated herein."  [#9-2 at 20].

Plaintiff argues first that the RFC does not address Dr. Alberts's finding that he has a moderate limitation in his ability to carry out simple instructions.  [#12 at 23].  He states that, according to Dr. Alberts's report, "a 'moderate' limitation means that the individual has more than a slight limitation in carrying out that task, although they are still able to 'function satisfactorily.'"  [*Id.* (quoting #9-10 at 535)].  Plaintiff contends that, pursuant to this definition, a finding of "moderate" limitation in carrying out simple instructions means that his "symptoms would sometimes interfere with his ability to carry out such instructions, even though he can generally understand them," and that "Dr. Alberts's finding contradicts that Lofley can carry out simple instructions on a consistent basis throughout an eight-hour workday."  [*Id.*].  The Commissioner argues that the ALJ included additional limitations within his query to the VE at the hearing, and therefore, he "reasonably accounted for any further limitations suggested by Dr. Alberts's opinion."  [#13 at 7].

The RFC states that Plaintiff can understand, remember, and carry out simple instructions.  [#9-2 at 15].  In the body of the section discussing the RFC, the ALJ reflects that "[i]n his medial source statement, [Dr. Alberts] assessed the claimant would have moderate restriction in understanding, remembering, carrying out or making judgment on simple work-related instructions."  [#9-2 at 20].  While the ALJ's remarks are not necessarily in tension with

the RFC, the RFC does not adequately reflect how the ALJ took Dr. Alberts's "moderate" restriction into consideration. As mentioned, the report defines "moderate" as "more than a slight limitation." [#9-10 at 535]. The report defines "mild" as "a slight limitation in this area, but the individual can generally function well." [*Id.*]. The RFC suggests that Plaintiff can perform without limitation a job that requires him to understand, remember and carry out simple instructions, which would not be consistent with Dr. Alberts's opinion. To the extent that the limitation in the RFC already accounts for the "moderate" limitation observed by Dr. Alberts, the ALJ does not make this finding clear in his discussion. And, while the ALJ observed that Plaintiff had testified that the medication prescribed by his psychiatrist controlled the symptoms associated with his mental illness, and that the medical evidence reflected that Plaintiff was "mentally intact, in no acute distress, and having logical and coherent thought processes," [#9-2 at 20], he did not use this finding to disagree with any part of Dr. Alberts's opinion. Upon determining that an opinion is entitled to great weight, the ALJ is not thereafter "entitled to pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of nondisability." *Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007) (citing *Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004); *Hamlin v. Barnhart,* 365 F.3d 1208, 1219 (10th Cir. 2004)). The ALJ is entitled to resolve conflict in the record, *Haga*, 482 F.3d at 1208 (citations omitted), but here the ALJ did not suggest that evidence conflicted with Dr. Alberts's assessment that Plaintiff has moderate limitations in understanding, remembering, and carrying out simple instructions, nor did he resolve the inconsistency. *See Frantz v. Astrue*, 509 F.3d 1299, 1303 (10th Cir. 2007) (recognizing that while "an ALJ does not have to discuss every piece of evidence…he or she is required to discuss the uncontroverted evidence not relied upon and significantly probative evidence that is rejected").

Plaintiff argues next that the RFC does not incorporate Dr. Alberts's finding that he has "marked restrictions in responding appropriately to usual work situations or to changes in a routine work setting." Plaintiff asserts that Dr. Alberts's report defines "marked" as representing "a substantial loss in the ability to function," and that because Dr. Alberts concluded he cannot effectively deal with changes in a routine work environment, the ALJ erred in finding that he is able to adapt to infrequent changes in the work setting. [#12 at 24 (quoting #9-10 at 535)]. Defendant argues that Dr. Alberts's opinion on this matter is "somewhat vague, suggesting that Plaintiff had a 'serious limitation' but providing no specific information about how that translated to his specific ability to work," and cites the Social Security Administration Program Operations Manual System ("POMS") for support that an ALJ need not include "nonspecific severity ratings" in the RFC assessment. [#13 at 7 (citing POMS DI 24510.063 Completion of Section I of SSA-4734-F4-SUP)].[3]

As an initial matter, Defendant did not attach a copy of the POMS from which she cites, and the POMS that this court was able to find did not contain the precise language Defendant uses. The section cited by Defendant that this court could find states merely that "[f]or each of the items under the four headings, A through D, one of the five boxes to the right of each item must be checked." Social Security Administration Program Operations Manual System § DI 24510.063 (October 14, 2010), available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0424510063. The section then defines the significance of the five boxes, i.e., "Markedly Limited" means "the evidence supports the

---

[3] The SSA's policy guidelines are provided in POMS, "which is a set of policies issued by the SSA 'to be used in processing claims.'" *Ramey v. Reinertson*, 268 F.3d 955, 964 (10th Cir. 2001) (quoting *McNamar v. Apfel,* 172 F.3d 764, 766 (10th Cir.1999)). "[W]e defer to the POMS provisions unless we determine they are 'arbitrary, capricious, or contrary to law.'" *Id.* at 964 n.2 (citation omitted).

conclusion that the individual cannot usefully perform or sustain the activity." *Id.* The section also notes that "[a]bsence of a rating (i.e., checking blocks 1, 2, or 3) for one or more items in a subsection in section I does not automatically preclude a narrative RFC statement for that subsection," and that "[d]iscussion with the disability examiner will resolve whether additional information about a subsection is necessary for a useful assessment of mental RFC." *Id.*[4] By either definition, the one provided on the form or as stated in POMS, Dr. Alberts opined that Plaintiff had a substantial loss in the ability to function and/or could not usefully perform or sustain activity with respect to responding to usual work situations and changes in the workplace. *See* [#9-10 at 536].

The ALJ's RFC states that Plaintiff "is able to adapt to infrequent changes in the work setting." [*Id.* at 15]. It is unclear from the ALJ's use of the term "infrequent" to what degree he found Plaintiff limited in this capacity. To the extent the ALJ disagreed with Dr. Alberts's findings, or determined that conflicting medical evidence prevented him from adopting Dr. Alberts's findings in whole, he was required to explain that decision. To the extent the ALJ intended to capture Plaintiff's limitations with use of the term "infrequent," the ALJ's intention is similarly not evident from his discussion of the issue. As stated above with respect to the moderate limitation, the ALJ is not authorized to give controlling weight to an opinion and then ignore parts of that opinion in rendering the disability determination. Therefore, the court is left with a record that is unclear as to why the ALJ appears to have only partially incorporated Dr.

---

[4] To Defendant's argument that Dr. Alberts's opinion on Plaintiff's ability to respond to work changes was somewhat vague, and that POMS explains that nonspecific severity ratings should not be included in the RFC assessment, Defendant does not address the fact that Dr. Alberts's opinion regarding Plaintiff's moderate limitations was no less vague and yet was incorporated into the RFC by the ALJ. *See* [#13 at 6-7].

Alberts's findings into the RFC, and remand is necessary so that the ALJ can explain the evidentiary support for his RFC determination.[5]

**B.    ALJ's Assessment of Plaintiff's Ability to Handle and Finger**

Mr. Lofley argues next that the ALJ erred in finding that he can constantly handle and finger with both hands. [#12 at 25]. He contends that he has difficulty holding items in his hands and the medical evidence supports a finding that he can only frequently handle and finger with both hands. Plaintiff acknowledges that the consultative examiner, Eniola Owi, M.D., did not include limitations in handling and fingering in the medical source statement, but asserts that "Dr. Owi's opinion is inconsistent with his own examination findings, which show that Lofley has reduced reflexes and sensation in both of his arms." [*Id.* at 26]. Defendant asserts that the ALJ's decision to attribute great weight to Dr. Owi's opinion and his RFC determination regarding Plaintiff's ability to handle and finger are both supported by substantial evidence.

Dr. Owi conducted a consultative examination of Plaintiff on February 27, 2013, to assess complaints of coronary artery disease, hypertension, and neck, shoulder, and arm pain. *See* [#9-10 at 521-525]. Dr. Owi found that Plaintiff had a normal range of motion through the cervical and lumbar spine and bilateral upper and lower extremities and hips, and that Plaintiff's fine manipulations were intact and he had good bilateral grip strength. He noted that Plaintiff's shoulders were "tender to palpation with discomfort on motion," but the extremities were otherwise normal, and he observed no hand tremors. [*Id.* at 524]. Dr. Owi reexamined Plaintiff on September 8, 2014. *See* [#9-10 at 539-553]. He observed that Plaintiff's upper extremities were non-tender and without discomfort to motion, and he assessed Plaintiff as being able to use

_____

[5] The court notes that during the hearing, when his attorney asked him which health problem he would "rank at the top," Plaintiff testified that his mental health issues interfere most with his ability to work. [#9-2 at 50].

both upper extremities to occasionally reach overhead, continuously reach in all directions, handle, finger, and feel, and frequently push and pull. [*Id.* at 542-543, 550]. He recorded Plaintiff's comments that his "pain is less now and he does not drop objects held in the hands as much as he did before the [neck] surgery," but noted that Plaintiff complains of "numbness at lateral left upper arm of 20 years duration and present for about 60% of the time." [*Id.* at 539]. The ALJ attributed great weight to Dr. Owi's opinions, noting "they are consistent with the medical evidence of record, the claimant's daily activities, and the RFC stated herein." [#9-2 at 20].

Plaintiff argues the medical evidence, including Dr. Owi's own findings, supports a more restrictive RFC with regard to his ability to handle and finger. Plaintiff cites Dr. Owi's notes that Plaintiff's "cervical spine was tender to palpitation," and he had "diminished sensation in his left arm and right hand, and decreased deep tendon reflexes in both of his arms." [#12 at 25]. Plaintiff also references his representation to Dr. Owi that he felt numbness in his left arm about 60 percent of the time. In his decision, the ALJ stated that he found that Dr. Owi's opinions were supported by the record. In doing so, he considered the following treatment records. Records from SunCoast Community Health Center, dated July through October 2012, showed that Plaintiff had normal motor strength, sensory, and gait, and normal range of motion of the cervical and lumbar spine, and reflected he had pain and tenderness and decreased range of motion in all planes of the right shoulder. *See* [#9-9 at 443-453, 459-462]. In October 2012, an orthopedic surgeon, Stuart Goldsmith, M.D., evaluated Plaintiff for left shoulder pain. *See* [#9-9 at 440-442, 454-455]. A physical examination showed he had full range of motion of the shoulder without pain, and Dr. Goldsmith noted no signs of muscle wasting or swelling. There were no deformities or abnormalities associated with any joints; elevation external and internal

rotations and abduction appeared to be normal; and functional strength testing, including flexion, abduction, and external rotation of the supraspinatus, infraspinatus, and teres minor muscles was normal. [*Id.* at 455-456]. In January 2013, Plaintiff successfully underwent anterior fusion at C4 through C6. His discharge exam revealed 5/5 motor strength in his upper and lower extremities. [#9-10 at 518]; *see* [*id.* at 498-520]. Plaintiff was examined by Dr. Owi for the first time the following month. Thereafter, treatment records from Tampa Family Health Center dated August through October 2014 demonstrated Plaintiff displayed a normal range of motion through his bilateral upper extremities. [#9-11 at 555-575, 580-603]. The ALJ gave great weight to Dr. Owi's opinions and "significant probative weight to the medical opinions and/or findings of the SunCoast Community Health Center and Tampa Family Health Center." [#9-2 at 20].

The evidence Plaintiff cites does not controvert the ALJ's finding. "The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence," *Lax*, 489 F.3d at 1084, and the court may not reverse an ALJ simply because he may have reached a different result based on the record. *Ellison*, 929 F.2d at 536. I find that the ALJ's conclusion is supported by substantial evidence. *Cf. Musgrave*, 966 F.2d at 1374 ("[e]vidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."). And, with respect to Plaintiff's complaints of arm numbness and pain, the ALJ did not find Plaintiff entirely credible, as explained below.

### C.     ALJ's Assessment of Plaintiff's Credibility

Finally, Mr. Lofley argues that the ALJ erred in his assessment of Plaintiff's credibility regarding his pain, and failed to sufficiently explain his reasoning. [#12 at 26]. Defendant responds that the RFC is actually more restrictive than what Plaintiff testified to at the hearing as

his range of ability, and in any event the medical evidence supports the ALJ's findings. [#13 at 10].

To begin, credibility determinations "are peculiarly the province of the finder of fact," and will not be disrupted if supported by substantial evidence. *Kepler v. Chater,* 68 F.3d 387, 390–91 (10th Cir. 1995). In *Kepler*, the Tenth Circuit identified multiple factors an ALJ could consider in evaluating subjective allegations of pain: "1) whether the objective medical evidence establishes a pain-producing impairment; 2) if so, whether there is a loose nexus between the proven impairment and the claimant's subjective allegations of pain; and 3) if so, whether considering all the evidence, claimant's pain is in fact disabling." *Id.* at 390. The ALJ may consider additional factors as well:

> [1] the levels of medication and their effectiveness, [2] the extensiveness of the attempts (medical or nonmedical) to obtain relief, [3] the frequency of medical contacts, [4] the nature of daily activities, [5] subjective measures of credibility that are peculiarly within the judgment of the ALJ, [6] the motivation of and relationship between the claimant and other witnesses, and [7] the consistency or compatibility of nonmedical testimony with objective evidence.

*Hargis v. Sullivan*, 945 F.2d 1482, 1489 (10th Cir. 1991) (quoting *Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988) (numbers added)). The Tenth Circuit has advised that "*Kepler* does not require a formalistic factor-by-factor recitation of the evidence," and, "[s]o long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility, the dictates of *Kepler* are satisfied." *White*, 287 F.3d at 909 (quoting *Qualls*, 206 F.3d at 1372).

The ALJ found that Plaintiff's testimony concerning the severity of his symptoms was not fully credible in light of the objective medical evidence. The ALJ found that the evidence "reveals the treatments for all of the alleged conditions have been relatively sparse and consisted with primarily conservative medication management with no recommendations for more

aggressive treatment options that would [be] expected for limitations of the degree alleged."

[#9-2 at 19]. The ALJ further found that with respect to the alleged musculoskeletal symptoms, "radiological studies show no greater than mild degenerative issues," and "other diagnostic studies fail to demonstrate any signs of fracture, lytic defects, or soft tissue calcifications of the lower extremities." [*Id.*] In so finding, the ALJ referenced the following records: inpatient hospital records from Tampa General Hospital, dated January 16, 2013 through January 19, 2013, [#9-10 at 498-520]; Dr. Goldsmith's office treatment records from Orthopeadic Medical Group of Tampa Bay, dated October 30, 2012, [#9-9 at 440-442]; and office treatment records from Tampa Family Health Care, dated August 20, 2014 through October 21, 2014, [#9-11 at 555-575, 580-603]. The ALJ observed that despite Plaintiff's "occasional complaints of musculoskeletal symptoms including back, and bilateral upper and lower extremities pain, physical examinations were normal, including gait, stance, balance and manipulations, and marked improvement with pain medications and surgery," and, the ALJ noted, Plaintiff walks without the use of an assistive device. [#9-2 at 19]. The ALJ also wrote that Plaintiff acknowledged that medication provided him with significant pain relief and allowed him to engage in a wide range of daily activities, and in so finding, the ALJ referenced a Function Report Plaintiff completed in December 2012, [#9-7 at 309-316], a Cardiac/Chest Pain Questionnaire Plaintiff completed in February 2013, [#9-7 at 342-346], and Plaintiff's testimony at the administrative hearing. [*Id.* at 19-20]. The ALJ then noted that with respect to Plaintiff's hypertension and cardiac-related issues, Plaintiff had not developed complications, his exams reflected normal results, and his primary care physician had observed that Plaintiff's symptoms were under control with medication. [#9-2 at 20].[6] Thus, the ALJ concluded that while the

_____

[6] The ALJ also noted that Plaintiff "admitted being a daily heavy smoker for several years," and

inconsistencies between the testimony and the evidence "reflect negatively on the claimant's credibility," he had given Plaintiff's assertions all due consideration and addressed Plaintiff's limitations in the RFC.

Plaintiff contends specifically that the record: (1) does not support the ALJ's conclusion that Plaintiff received only "conservative" treatment for his symptoms; (2) contradicts the ALJ's finding that Plaintiff's physical examinations were mostly normal; and (3) does not demonstrate that Plaintiff engages in a "wide range" of daily activities. I agree with Plaintiff that the Function Report and Cardiac/Chest Pain Questionnaire reflects that Plaintiff represented he was in pain to such a degree that it prevented him from working or participating in daily activities. But these are Plaintiff's subjective complaints and not objective medical findings. Plaintiff testified essentially that his symptoms, while still present, had lessened since his neck surgery, [#9-2 at 47], and that he participates in chores around the house, such as weed eating and cutting grass, and he helps look after a grandniece; and, although Plaintiff stated he continues to drop items such as cups of coffee, he testified that he could chop and grate vegetables for "about an hour." [*Id.* at 53]. A review of the medical records the ALJ cited demonstrates that Plaintiff's physical examinations were often normal as a result of successful management of the underlying medical condition. It is clear that the ALJ did not find Plaintiff's representations of the severity of his symptoms fully credible; however, in evaluating Plaintiff's credibility, the ALJ set forth specific reasons for discrediting Plaintiff's complaints of pain and inability to work, as described above. *Cf. Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004) ("it is not enough for the ALJ simply to list the relevant factors; he must also 'explain why the specific evidence relevant

that he continues to smoke heavily despite counseling as to the effects of smoking. The ALJ wrote, "[t]hese factors suggest that the symptoms may not have been as serious as has been alleged in connection with this application and appeal." [#9-2 at 20].

to each factor led him to conclude claimant's subjective complaints were not credible.'") (citation omitted). The court is not tasked with reweighing the evidence, nor is it authorized to do so. *White*, 271 F.3d at 1260. Accordingly, I find the ALJ did not err in his assessment of Plaintiff's credibility.

## CONCLUSION

For the reasons set forth herein, the court hereby AFFIRMS IN PART, and REVERSES AND REMANDS IN PART, for the ALJ to explain his treatment in the formulation of the RFC of Dr. Alberts's opinion regarding Plaintiff's (1) moderate limitation in understanding, remembering, and carrying out simple instructions, and (2) marked limitation in being able to respond appropriately to usual work situations and to changes in a routine work setting.

DATED: March 22, 2018                    BY THE COURT:

_____
Nina Y. Wang
United States Magistrate Judge